**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| MARY JO BARIL, MARY DEFATTE, MONIQUE GAMEZ, BRIANNE HUIZAR, DANIEL McGINTY, AARON PENTZ, JOSE SANTOS, BARRY SCHWARTZE, DEIDRE SWOOPE, and KYLE TROSKOT individually on on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>ORACLE CORPORATION, AFL CORPORATION, LKQ MANAGEMENT COMPANY, RHEEM MANUFACTURING COMPANY, COX ENTERPRISES, INC., MKS INC., GLOBALLOGIC, INC., DAVID YURMAN HOLDINGS LLC, ENVOY AIR INC., TRIMBLE INC., MASTEC INC., MILGARD MANUFACTURING LLC,<br><br>              Defendants. | Case No.   1:25-cv-1873<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Mary Jo Baril, Mary Defatte, Monique Gamez, Brianne Huizar, Daniel McGinty, Aaron Pentz, Jose Santos, Barry Scjwartze, Deidre Swoope, and Kyle Troskot ("Plaintiffs") bring this Class Action Complaint ("Complaint") as individuals and on behalf of all others similarly situated, against Defendants Oracle Corporation ("Oracle"), AFL Corporation ("AFL"), LKQ Management Company ("LKQ"), Rheem Manufacturing Company ("Rheem"), Cox Enterprises, Inc. ("Cox"), MKS Inc. ("MSK"), GlobalLogic, Inc. ("GlobalLogic"), David Yurman Holdings LLC ("David Yurman"), Envoy Air Inc. ("Envoy"), Trimble Inc. ("Trimble"), MasTec, Inc. ("MasTec"), and Milgard Manufacturing LLC ("Milgard") (collectively "Defendants") and allege,

upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This class action arises out of the recent data breach ("Data Breach") involving Defendants wherein the notorious cybergang, Cl0p ("Clop"), gained unauthorized access to Plaintiffs' and the Class Members' personally identifiably information ("PII" or "Private Information").

2.     Defendant Oracle provides database software and cloud computing software services to companies across the United States.[1] Oracle's services and products include enterprise resource planning, human capital management, customer relationship management, enterprise performance management, customer experience commerce, and supply chain management. Oracle also offers an application called the Oracle E-Business Suite ("EBS").[2]

3.     Upon information and belief, Defendants AFL, LKQ, Rheem, Cox, MSK, David Yurman, Envoy, Trimble, MasTec, and Milgard (collectively "Employer Defendants") used Defendant Oracle's EBS system to collect, manage, and store its current and former employees' Private Information.

4.     Plaintiffs and the Class Members are current or former employees of Employer Defendants. Employer Defendants provided Oracle with Plaintiffs' and the Class Members' Private Information with the intent that Oracle use, maintain, and store the Private Information.

5.     The notorious cybergang, Cl0p ("Clop"), gained unauthorized access to Oracle's EBS network and Plaintiffs' and the Class Members' Private Information stored thereon.

6.     Plaintiffs bring this Complaint against Defendants for its failure to properly secure

---

[1] *See* https://www.oracle.com/cloud/ (last visited Nov. 19, 2025).
[2] *See* https://www.oracle.com/applications/ebusiness/ (last visited Nov. 19, 2025).

and safeguard the personally identifiable information that it collected and maintained as part of its regular business practices, including Plaintiffs' and Class Members' names, Social Security numbers, dates of birth, physical address, employment related information, financial account numbers, identification documents such as passports, driver's licenses, national ID numbers, signatures, health insurance information, and other sensitive information.

7.      The notorious cybergang, Clop, has already claimed responsibility for the Data Breach. Clop announced the Data Breach on its illegal website, listing 29 EBS customers, including Employer Defendants, in the list of breached entities. In September 2025, Clop began sending extortion emails to those involved in the Data Breach.[3]

8.      Upon information and belief, in order to obtain employment, Plaintiffs and the Class Members (as former employees of Employer Defendants) were required to entrust Employer Defendants with sensitive, non-public PII, without which Employer Defendants could not perform their regular business activities, in order to obtain employment or certain employment benefits at Defendants. Defendants retain this information for many years and even after their employer-employee relationship has ended.

9.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiffs and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

10.     Defendants failed to adequately protect Plaintiffs' and the Class Members' PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendants' negligent and/or careless acts and omissions and its utter

---

[3] Eduard Kovacs, *Nearly 30 Alleged Victims of Oracle EBS Hack Named on Cl0p Ransomware Site*, Security Week (Nov. 10, 2025) https://www.securityweek.com/nearly-30-alleged-victims-of-oracle-ebs-hack-named-on-cl0p-ransomware-site/.

failure to protect employees' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk of identity theft and fraud to victims of the Data Breach will remain for their respective lifetimes.

11.    In breaching its duties to properly safeguard employees' PII and give employees' timely, adequate notice of the Data Breach's occurrence, Defendants' conduct amounts to negligence and/or recklessness and violates federal and state statutes.

12.    Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect their PII; (ii) warn them of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts at least to negligence and violates federal and state statutes.

13.    Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

14.    Plaintiffs and Class Members have suffered injury as a result of Defendants'

conduct. These injuries include: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

15.    Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## PARTIES

16.    Plaintiff Mary Jo Baril is a natural resident and citizen of Dracut, Massachusetts where she intends to remain. Plaintiff Baril is a former employee of MKS.

17.    Plaintiff Mary Defatte is a natural resident and citizen of Fort Walton Beach, Florida where she intends to remain. Plaintiff Defatte is a former employee of AFL.

18.    Plaintiff Monique Gamez is a natural resident and citizen of San Jose, California where she intends to remain. Plaintiff Gamez is a former employee of MasTec.

19.    Plaintiff Brianna Huizar is a natural resident and citizen of San Antonio, Texas where she intends to remain. Plaintiff Huizar is a former employee of LKQ.

20.    Plaintiff Daniel McGinty is a natural resident and citizen of Dracut, Massachusetts

where he intends to remain. Plaintiff McGinty is a former employee of Envoy.

21.    Plaintiff Aaron Pentz is a natural resident and citizen of Pingree Grove, Illinois where he intends to remain. Plaintiff Pentz is a former employee of Milgard.

22.    Plaintiff Julie Rachel is a natural resident and citizen of Blairsville, Georgia where she intends to remain. Plaintiff Rachel is a former employee of Cox.

23.    Plaintiff Jose Santos is a natural resident and citizen of Boca Raton, Florida where he intends to remain. Plaintiff Santos is a former employee of David Yurmam.

24.    Plaintiff Barry Schwartze is a natural resident and citizen of Lakewood, Colorado where he intends to remain. Plaintiff Schwartze is a former employee of Trimble.

25.    Plaintiff Deirdre Swoope is a natural resident and citizen of Douglasville, Georgia where she intends to remain. Plaintiff Swoope is a former employee of GlobalLogic.

26.    Plaintiff Kyle Troskot is a natural resident and citizen of Aledo, Texas where he intends to remain. Plaintiff Troskot is a former employee of Rheem.

27.    Defendant Oracle Corporation is incorporated in Delaware and with its principal place of business at 2300 Oracle Way, Austin, Texas 78741. The registered agent for service of process is Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

28.    Defendant AFL Corporation is incorporated in Texas with its principal place of business at 207 Gray St., Ste. B, Houston, TX 77002. The registered agent for service of process is Ali Bachir Ghandour at 1200 Post Oak Blvd, Suite 1010, Houston, TX 77056. Defendant AFL used Oracle's EBS software to store and maintain current and former employees' Private Information.[4]

---

[4] *See* https://www.prnewswire.com/news-releases/afl-chooses-bias-to-spearhead-its-digital-transformation-strategy-to-oracle-cloud-301276086.html (last visited Nov. 19, 2025).

29.    Defendant LKQ Management Company is incorporated in Delaware with its principal place of business at 120 N. Lasalle, Ste. 3300, Chicago, IL 60602. The registered agent for service of process is Corporate Creations Network Inc. at 2595 N Dallas Pkwy, Ste. 350, Frisco, TX 75034. Defendant LKQ used Oracle's EBS software to store and maintain current and former employees' Private Information.[5]

30.    Defendant Rheem Manufacturing Company is incorporated in Delaware with its principal place of business at 1100 Abernathy Road, Ste. 1700, Atlanta, GA 30328. The registered agent for service of process is Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092. Defendant Rheem used Oracle's EBS software to store and maintain current and former employees' Private Information.[6]

31.    Defendant GlobalLogic Inc. is incorporated in Delaware and with its principal place of business at 2535 Augustine Drive, 5th Floor, Santa Clara, California 95054. The registered agent for service of process is Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218. Defendant GlobalLogic Inc. used Oracle's EBS software to store and maintain current and former employees' Private Information.[7]

32.    Defendant Cox Enterprises, Inc. is incorporated in Delaware with its principal place of business at 6205 Peachtree Dunwoody Road, Atlanta, GA 30328. The registered agent for service of process is Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092. Defendant Cox used Oracle's EBS software to store and maintain current and former

---

[5] *See* https://www.infosys.com/services/oracle/case-studies/live-enterprise-cloud-infrastructure.html (last visited Nov. 19, 2025).

[6] *See* https://www.oracle.com/news/announcement/rheem-boosts-efficiency-and-powers-a-more-sustainable-future-with-oracle-cloud-2023-11-07/ (last visited Nov. 19, 2025).

[7] *See* https://www.bleepingcomputer.com/news/security/globallogic-warns-10-000-employees-of-data-theft-after-oracle-breach/ (last visited Nov. 19, 2025).

employees' Private Information.[8]

33.    Defendant MKS Inc. is incorporated in Massachusetts with its principal place of business at 2 Tech Dr., Andover, MA 01810. The registered agent for service of process is Cogency Global Inc. at 1601 Elm Street, Suite 4360, Dallas, TX 75201. Defendant MKS used Oracle's EBS software to store and maintain current and former employees' Private Information.

34.    Defendant David Yurman Holdings LLC is incorporated in New York with its principal place of business at 24 Vestry Street, New York, NY 10013. The registered agent for service of process is Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218. Defendant David Yurman used Oracle's EBS software to store and maintain current and former employees' Private Information.[9]

35.    Defendant Envoy Air Inc. is incorporated in Texas with its principal place of business in Dallas, Texas. The registered agent for service of process is Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218. Defendant Envoy used Oracle's EBS software to store and maintain current and former employees' Private Information.[10]

36.    Defendant Trimble Inc. is incorporated in Delaware with its principal place of business in Westminster, CO. The registered agent for service of process is C T Corporation System at 1999 Bryan St. Ste. 900, Dallas, TX 75210-3136. Defendant Trimble used Oracle's EBS software to store and maintain current and former employees' Private Information.[11]

---

[8] *See* https://www.appsruntheworld.com/customers-database/customers/view/cox-enterprises-inc-usa (last visited Nov. 19, 2025).

[9] *See* https://www.appsruntheworld.com/customers-database/purchases/view/david-yurman-enterprises-llc-united-states-selects-oracle-e-business-suite-for-erp-financial (last visited Nov. 19, 2025).

[10] *See* https://therecord.media/regional-airline-envoy-oracle (last visited Nov. 19, 2025).

[11] *See* https://transportation.trimble.com/blog/alk-maps-now-available-within-oracle-transportation-management-

37.    Defendant MasTec, Inc. is incorporated in Florida with its principal place of business in Coral Gables, FL. The registered agent for service of process is Corporation Service Company at 1201 Hays St, Tallahassee, FL 32301. Defendant MasTec used Oracle's EBS software to store and maintain current and former employees' Private Information.[12]

38.    Defendant Milgard Manufacturing LLC is incorporated in Delaware with its principal place of business in Gratz, Pennsylvania. The registered agent for service of process is C T Corporation System at 1999 Bryan St. Suite 900, Dallas, TX 75201. Defendant Milgard used Oracle's EBS software to store and maintain current and former employees' Private Information.[13]

## JURISDICTION AND VENUE

39.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including one or more of the named Plaintiffs, is a citizen of a state different from Defendants.

40.    This Court has personal jurisdiction over Defendants because they regularly conduct business in this District, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

41.    Venue is proper under 18 U.S.C § 1391(b)(1) because the events giving rise to Plaintiffs' claims occurred in this district.

---

cloud#:~:text=Princeton%2C%20N.J.%20%E2%80%93%20February%208%2C,potential%20pickup%20and%20delivery%20impacts (last visited Nov. 19, 2025).

[12] *See* https://www.appsruntheworld.com/customers-database/customers/view/mastec-inc-united-states (last visited Nov. 19, 2025).

[13] See https://info.syntax.com/success-story/2/milgard-manufacturing (last visited Nov. 19, 2025).

## FACTUAL ALLEGATIONS

### Background of Defendants

42.    Defendant Oracle provides database software and cloud computing software services to companies across the United States, including Oracle's E-Business Suite.

43.    Oracle's EBS is a comprehensive suite of business applications for managing operations like financials, supply chain, human resources, and procurement.[14]

44.    Plaintiffs and Class Members are current and former employees of Employer Defendants.

45.    In order to apply to be an employee of or obtain certain employment-related benefits from Employer Defendants, Plaintiffs and Class Members were required to provide sensitive and confidential PII, including their names, dates of birth, Social Security numbers, addresses, contact information, financial account information, health insurance information, and other sensitive information.

46.    The information held by Defendants in the EBS software at the time of the Data Breach included the unencrypted PII of Plaintiffs and Class Members.

47.    Upon information and belief, Employer Defendants made promises and representations to its employees, including Plaintiffs and Class Members, that the PII collected from them as a condition of their employment would be kept safe, confidential, that the privacy of that information would be maintained, and that Employer Defendants would delete any sensitive information after it was no longer required to maintain it.

48.    Plaintiffs and Class Members provided their PII to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations

---

[14] *See* https://www.oracle.com/applications/ebusiness/ (last visited Nov. 19, 2025).

to keep such information confidential and secure from unauthorized access.

49.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and Class Members relied on the sophistication of Defendants to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

50.     Plaintiffs and other members of the Class entrusted their PII to Defendants.

51.     Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendants had a legal duty to keep Plaintiffs' and the Class Members' PII safe and confidential.

52.     Defendants had obligations created by FTC Act, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

53.     Defendants derived a substantial economic benefit from collecting Plaintiffs' and Class Members' PII. Without the required submission of PII, Defendants could not perform the services they provide.

54.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

55.     Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiffs and the Class Members from involuntary disclosure to third parties.

56.     Despite recognizing its duty to do so, on information and belief, Defendants had not implemented reasonable cybersecurity safeguards or policies to protect its Plaintiffs' and the

Class Members' PII or trained their IT or data security employees to prevent, detect, and stop breaches of its systems. Rather, Defendants chose to store Plaintiffs' and the Class Members' PII on an unsecure network, leaving their PII vulnerable for cybercriminals to take. As a result, Defendants leave significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' PII.

### *The Data Breach*

57.    In September 2025, Oracle EBS users received extortion emails from the cybercriminals claiming a data breach of Oracle's EBS system.[15]

---

[15] Lawrence Abrams, *Clop Extortion Emails Claim Theft of Oracle E-Business Suite Data*, (Oct. 1, 2025), https://www.bleepingcomputer.com/news/security/clop-extortion-emails-claim-theft-of-oracle-e-business-suite-data/ (last visited Nov. 19, 2025).

Dearest executive,

We are CL0P team. If you haven't heard about us, you can google about us on internet.

We have recently breached your Oracle E-Business Suite application and copied a lot of documents.
All the private files and other information are now held on our systems.

But, don't worry. You can always save your data for payment. We do not seek political power or care about
any business.
So, your only option to protect your business reputation is to discuss conditions and pay claimed sum.
In case you refuse, you will lose all abovementioned data: some of it will be sold to the black actors, the rest will be
published on our blog and shared on torrent trackers.

We always fulfil all promises and obligations.

We have carefully examined the data we got. And, regrettably for your company, this analysis
shows that estimated financial losses, harm to reputation , and regulatory fines are likely to materially exceed the
amount claimed.

Lower you see our contact email addresses:
support@pubstorm.com
support@pubstorm.net

As evidence, we can show any 3 files you ask or data row.
We are also ready to continue discussing the next steps after you confirm that you are a legitimate representative of
the company.
We are not interested in destroying your business. We want to take the money and you not hear from us again.
Time is ticking on clock and in few days if no payment we publish and close chat.
Please convey this information to your executive and managers as soon as possible.
After a successful transaction and receipt of payment we promise

1) technical advice
2) We will never publish you data
3) Everything we download will be delete w/proof
4) Nothing will ever disclose

Decide soon and recall that no response result in blog posting. Name is first and soon data after. We advice not
reach point of no return.

KR CL0P

58.     The email campaign, which involved extortion emails being sent to executives at

dozens of organizations, is believed to have been conducted by a cluster of a profit-driven threat

actor tracked as FIN11.

59.     The notorious cybergang, Clop, has already claimed responsibility for the Data

Breach. Clop was previously linked by the cybersecurity community to FIN11 and the decision to

use it as the public-facing entity for the campaign was likely motivated by it prior involvement in

similar high-impact campaigns targeting customers of Cleo, MOVEit, and Fortra file transfer

products.

60.    Twenty-nine alleged EBS users have been listed on the Clop leak website to date. The organizations that were the first to be named, such as Harvard University, South Africa's Wits University, and American Airlines subsidiary Envoy Air, confirmed being impacted shortly after they were named by the attackers in mid-October.

61.    Clop was able to obtain hundreds of gigabytes – and in some instances several terabytes – of files from difference EBS users.

62.    Clop then announced that the Data Breach on its dark web site:



63.    Defendants have not yet announced the Data Breach, the dates of the Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest

in ensuring that their PII remains protected. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

64.    Upon information and belief: a) this Data Breach was the work of cybercriminals; b) the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (or exfiltrated data, or in layperson's terms "stole" data); and c) once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiffs' and Class Members' PII, including their Social Security numbers, for download and theft.

65.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

66.    The attacker targeted, accessed, and acquired files in Defendants' computer systems containing unencrypted PII of Plaintiffs and Class Members, including their names and Social Security numbers. Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

67.    The targeted cyberattack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the PII of employees like Plaintiffs and Class Members.

68.    Plaintiffs further believe that their PII and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

69.    It is still unclear exactly which Oracle EBS vulnerabilities have been exploited in

the campaign. The most likely candidates are CVE-2025-61882 and CVE-2025-61884, both of which can be exploited remotely without authentication or user interaction to gain access to sensitive data. In the case of CVE-2025-61882, exploitation as a zero-day appears to have started at least two months prior to patches being released.

70.     Accordingly, Plaintiffs and Class Members now face an increased risk and in fact a near certainty of fraud and identity theft. In addition, Plaintiffs and the Class Members also lost the benefit of the bargain they made with Defendants.

### Data Breaches Are Preventable

71.     Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

72.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[16]

73.     To prevent and detect cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

---

[16] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[17]

74.    To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-    Prioritize and treat commodity malware infections as potential full compromise;

---

[17] *Id.* at 3-4.

**Include IT Pros in security discussions**

-      Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-      Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-      Monitor for adversarial activities
-      Hunt for brute force attempts
-      Monitor for cleanup of Event Logs
-      Analyze logon events;

**Harden infrastructure**

-      Use Windows Defender Firewall
-      Enable tamper protection
-      Enable cloud-delivered protection
-      Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[18]

75.      Given that Defendants were storing the sensitive PII of its current and former employees, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

76.      The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiffs and the Class Members.

***Defendants Acquire, Collect, and Store Plaintiffs' and the Class Members' PII***

77.      As a condition of employment with Defendant, Plaintiffs and Class Members were required to give their sensitive and confidential PII to Defendants.

---

[18] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

78.    Defendants retain and store this information and derive a substantial economic benefit from the PII that it collects. But for the collection of Plaintiffs' and Class Members' PII, Defendants would be unable to perform their services.

79.    By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

80.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendants to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

81.    Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiffs and Class Members.

***Defendants Knew or Should Have Known of the Risk Because Entities in Possession of PII are Particularly Susceptible to Cyber Attacks***

82.    Data thieves regularly target companies like Defendants due to the highly sensitive information that they custody. Defendants knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

83.    Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store PII and other sensitive information, like Defendants, preceding the date of the breach.

84.    In 2023, an all-time high for data compromises occurred, with 3,205 compromises

affecting 353,027,892 total victims.[19] Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry.[20] The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.[21] The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[22]

85.    In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendants knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

86.    Additionally, as companies became more dependent on computer systems to run their business,[23] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[24]

87.    As a custodian of PII, Defendants knew, or should have known, the importance of

---

[19] *See 2023 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2024) https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.
[20] *Id*.
[21] *Id.*
[22] *Id.*
[23] *FEDS Notes*, Board of Governors of the Federal Reserve System (May 12, 2022) https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.
[24] Dr. Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS (Mar. 24, 2022) https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

safeguarding the PII entrusted to them by Plaintiffs and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

88.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

89.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

90.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

91.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

92.     The ramifications of Defendants' failure to keep secure the PII of Plaintiffs and Class Members are long-lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

93.     As an entity in possession of a substantial amount of PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached.

This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

**Value of PII**

94.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[25] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[26]

95.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[27] For example, Personal Information can be sold at a price ranging from $40 to $200.[28] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[29]

96.    Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social

---

[25] 17 C.F.R. § 248.201 (2013).

[26] *Id.*

[27] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[28] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[29]    *In    the    Dark*,    VPNOverview,    2019,    *available    at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 17, 2022).

Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.[30]

97.    It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

98.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [31] Moreover, "[b]ecause many organizations still use Social Security numbers as the primary identifier, exposure to identity theft and fraud remains."[32]

99.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other
> personal information about you. Identity thieves can use your number and your

---

[30] Alison Grace Johansen, *5 Kinds of ID Theft Using a Social Security Number*, LifeLock by Norton (Nov. 30, 2017) https://lifelock.norton.com/learn/identity-theft-resources/kinds-of-id-theft-using-social-security-number.

[31] *See Avoid Identity Theft: Protect Social Security Numbers*, Social Security, Philadelphia Region  https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's %20collection%20and%20use,and%20other%20private%20information%20increases    (last visited Mar. 12, 2025).

[32] *Id.*

good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[33]

100.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[34] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[35]

101.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

102.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

103.    For these reasons, some courts have referred to Social Security numbers as the

---

[33] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[34] *How to Protect Yourself from Social Security Number Identity Theft*, Equifax, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Mar. 12, 2025).

[35] Julia Kagan, *What is an SSN? What to Know About Social Security Numbers*, Investopedia (Sept. 2, 2024) https://www.investopedia.com/terms/s/ssn.asp.

[36] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

"gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

104.    Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[37]

105.    Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[38]

---

[37] *Your Social Security Number: Controlling the Key to Identity Theft*, Rob Bonta Attorney General, https://oag.ca.gov/idtheft/facts/your-ssn (last accessed on January 21, 2024).

[38] *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach*, Forbes,            Apr.            20,            2021,            *available            at:*

106.    A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web.  On its own, a forged license can sell for around $200."[39]

107.    According to national credit bureau Experian, scammers can commit a variety of criminal acts using your driver's licenses number, including (i) opening financial accounts in your name; (ii) creating fake IDs; (iii) selling your license number, (iv) carrying out mail fraud; and (v) generating a synthetic identity.[40]

108.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[41]  However, this is not the case. As cybersecurity experts point out:

> It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks.[42]

109.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[43]

110.    Based on the foregoing, the information compromised in the Data Breach is

---

https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658.

[39] *Id.*

[40] John Egan, *What Should I Do If My Driver's License Number is Stolen*, Experian (Jun. 13, 2024) https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

[41] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO Magazine (Apr. 23, 2021) https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/.

[42] *Id.*

[43] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited on Feb. 21, 2023).

significantly more valuable than the loss of, for example, credit card information in a data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, date of birth, and name.

111.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[44]

112.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

113.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[45]

114.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

---

[44] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[45] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

### *Defendants Fail to Comply with FTC Guidelines*

115.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

116.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[46]

117.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[47]

118.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

119.    The FTC has brought enforcement actions against businesses for failing to

---

[46] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).

[47] *Id.*

adequately and reasonably protect employee data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential employee data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

120.    These FTC enforcement actions include actions against entities like Defendants.

121.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

122.    Defendants failed to properly implement basic data security practices.

123.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

124.    Upon information and belief, Defendants were at all times fully aware of their obligation to protect the PII it chose to store, Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### *Defendants Fail to Comply with Industry Standards*

125.    As noted above, experts studying cyber security routinely identify employers in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII

which they collect and maintain.

126.    Several best practices have been identified that, at a minimum, should be implemented by employers in possession of PII, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

127.    Other best cybersecurity practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

128.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

129.    These foregoing frameworks are existing and applicable industry standards for employers safeguarding their employees' data, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the

threat actor and causing the Data Breach.

***Defendants are in Violation of the Texas Deceptive Trade Practices Act ("TDTPA")***

130.    Under Tex. Bus. & Com. Code Ann. § 521.002, the term "Sensitive Personal Information" means:

> (A) an individual's first name or first initial and last name in combination with any one or more of the following items, if the name and the items are not encrypted:
>> (i) social security number;
>> (ii) driver's license number or government-issued identification number; or
>> (iii) account number or credit or debit card number in combination with any
> required security code, access code, or password that would permit access to an individual's financial account; or
> (B) information that identifies an individual and relates to:
>> (i) the physical or mental health or condition of the individual;
>> (ii) the provision of health care to the individual; or
>> (iii) payment for the provision of health care to the individual.

Tex. Bus. & Com. Code Ann. § 521.002.

131.    An entity doing business in Texas must "implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect and safeguard from unlawful use or disclosure any sensitive personal information collected or maintained by the business in the regular course of business." Tex. Bus. & Com. Code § 521.052. Business Duty to Protect Sensitive Personal Information

132.    An entity doing business in Texas must "destroy or arrange for the destruction of customer records containing sensitive personal information within the business's custody or control that are not to be retained by the business." Tex. Bus. & Com. Code § 521.052. Business Duty to Protect Sensitive Personal Information.

133.    In failing to implement and maintain reasonable procedures or take corrective action to safeguard Plaintiffs' and the Class Members' confidential PII and failing to properly destroy Plaintiffs' and the Class Members' PII, Defendants violated the TDTPA.

*Common Injuries and Damages*

134.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

*The Data Breach Increases Victims' Risk of Identity Theft*

135.    The unencrypted PII of Plaintiffs and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

136.    Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

137.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

138. Plaintiffs' and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

139. Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[48]

140. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[49]

141. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[50] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from

---

[48] *See* N.C. Gen. Stat. § 132-1.10(1).

[49] Husayn Kassai, *BankThink Banks Need to Stop Relying on Social Security Numbers*, American Banker (Nov. 12, 2018) https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers.

[50] Ann Carrns, *Just 5 Banks Prohibit Use of Social Security Numbers*, The New York Times (Mar. 20, 2013) https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/.

your bank account"[51]

142.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[52]

143.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

144.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

145.    The existence and prevalence of "Fullz" packages means that the PII stolen from

---

[51] Nikkita Walker, *What Can Someone Do With Your Social Security Number?*, Credit.com (Oct. 19, 2023) https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[52] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/.

the data breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

146.    Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

147.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

*Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

148.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

149.    Defendants' extensive suggestion of steps that Plaintiffs and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiffs and Class Members must undertake in response to the Data Breach. Plaintiffs' and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiffs and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of Defendant's Notice Letter.

150.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, contacting banks to ensure their accounts are secured, and signing up for credit monitoring

insurance services. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

151.   Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[53]

152.   Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[54]

153.   And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

*Diminution of Value of PII*

154.   PII is a valuable property right.[55] Its value is axiomatic, considering the value of

---

[53] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[54] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

[55] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

155.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[56]

156.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[57] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[58,59] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[60]

157.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

---

[56] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[57] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[58] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, Voices (Nov. 5, 2019) https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[59] The Personal Data Revolution, DataCoup, https://datacoup.com/ (last visited Mar. 12, 2025).

[60] DIGI.ME, https://digi.me/how (last visited Mar. 12, 2025).

158.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

159.    The fraudulent activity resulting from the Data Breach may not come to light for years.

160.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

161.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to more than twenty thousand individuals detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

162.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

*Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary*

163.    Given the type of targeted attack, the sophisticated criminal activity, and the type of PII involved in this case, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or

lines of credit; or file false unemployment claims.

164.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

165.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

166.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from the Data Breach.

*Loss of Benefit of the Bargain*

167.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to work for Defendant under certain terms, Plaintiffs and other reasonable employees understood and expected that Defendant would properly safeguard and protect their PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members' employment positions were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**Plaintiffs' Individual Experiences**

Plaintiff Mary Jo Baril's Experience

168.    Defendant MKS obtained Plaintiff Baril's PII in the course of conducting its regular business operations, related to Plaintiff Baril's employment.

169.    As a condition of her employment at MKS, she was required to supply MKS and

Oracle with her PII.

170.    Plaintiff Baril is very careful about sharing her sensitive PII. Plaintiff Baril stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

171.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Baril's PII in their system.

172.    As a result of the Data Breach, Plaintiff Baril made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure her accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Baril has spent significant on mitigation activities in response to the Data Breach—valuable time Plaintiff Baril otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

173.    Subsequent to the Data Breach, Plaintiff Baril has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

174.    The Data Breach has caused Plaintiff Baril to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

175.    As a result of the Data Breach, Plaintiff Baril anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

176.    As a result of the Data Breach, Plaintiff Baril is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

177.    Plaintiff Baril has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

Plaintiff Mary Defatte's Experience

178.    Defendant AFL obtained Plaintiff Defatte's PII in the course of conducting its regular business operations, related to Plaintiff Defatte's employment.

179.    As a condition of her employment at AFL, she was required to supply AFL and Oracle with her PII.

180.    Plaintiff Defatte is very careful about sharing her sensitive PII. Plaintiff Defatte stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

181.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Defatte's PII in their system.

182.    As a result of the Data Breach, Plaintiff Defatte made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data

Breach, contacting banks to ensure her accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Defatte has spent significant on mitigation activities in response to the Data Breach—valuable time Plaintiff Defatte otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

183.    Subsequent to the Data Breach, Plaintiff Defatte has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

184.    The Data Breach has caused Plaintiff Defatte to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

185.    As a result of the Data Breach, Plaintiff Defatte anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

186.    As a result of the Data Breach, Plaintiff Defatte is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

187.    Plaintiff Defatte has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

Plaintiff Monique Gamez's Experience

188.    Defendant MasTec obtained Plaintiff Gamez's PII in the course of conducting its regular business operations, related to Plaintiff Gamez's employment.

189.    As a condition of her employment at MasTec, she was required to supply MasTec and Oracle with her PII.

190.    Plaintiff Gamez is very careful about sharing her sensitive PII. Plaintiff Gamez stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

191.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Gamez's PII in their system.

192.    As a result of the Data Breach, Plaintiff Gamez made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure her accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Gamez has spent significant on mitigation activities in response to the Data Breach—valuable time Plaintiff Gamez otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

193.    Subsequent to the Data Breach, Plaintiff Gamez has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with

attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

194.    The Data Breach has caused Plaintiff Gamez to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

195.    As a result of the Data Breach, Plaintiff Gamez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

196.    As a result of the Data Breach, Plaintiff Gamez is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

197.    Plaintiff Gamez has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

<u>Plaintiff Brianne Huizar's Experience</u>

198.    Defendant LKQ obtained Plaintiff Huizar's PII in the course of conducting its regular business operations, related to Plaintiff Huizar's employment.

199.    As a condition of her employment at LKQ, she was required to supply LKQ and Oracle with her PII.

200.    Plaintiff Huizar is very careful about sharing her sensitive PII. Plaintiff Huizar stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

201.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Huizar's PII in their system.

202.    As a result of the Data Breach, Plaintiff Huizar made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure her accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Huizar has spent significant on mitigation activities in response to the Data Breach—valuable time Plaintiff Huizar otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

203.    Subsequent to the Data Breach, Plaintiff Huizar has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

204.    The Data Breach has caused Plaintiff Huizar to suffer fear, anxiety, and stress,

which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

205.    As a result of the Data Breach, Plaintiff Huizar anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

206.    As a result of the Data Breach, Plaintiff Huizar is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

207.    Plaintiff Huizar has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

Plaintiff Daniel McGinty's Experience

208.    Defendant Envoy obtained Plaintiff McGinty's PII in the course of conducting its regular business operations, related to Plaintiff McGinty's employment.

209.    As a condition of his employment at Envoy, he was required to supply Envoy and Oracle with his PII.

210.    Plaintiff McGinty is very careful about sharing his sensitive PII. Plaintiff McGinty stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

211.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff McGinty's PII in their system.

212.    As a result of the Data Breach, Plaintiff McGinty made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data

Breach, contacting banks to ensure his accounts are secured, and signing up for credit monitoring insurance services. Plaintiff McGinty has spent significant on mitigation activities in response to the Data Breach—valuable time Plaintiff McGinty otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

213.    Subsequent to the Data Breach, Plaintiff McGinty has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

214.    The Data Breach has caused Plaintiff McGinty to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed his of key details about the Data Breach's occurrence.

215.    As a result of the Data Breach, Plaintiff McGinty anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

216.    As a result of the Data Breach, Plaintiff McGinty is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

217.    Plaintiff McGinty has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

Plaintiff Aaron Pentz's Experience

218.    Defendant Milgard obtained Plaintiff Pentz's PII in the course of conducting its regular business operations, related to Plaintiff Pentz's employment.

219.    As a condition of his employment at Milgard, he was required to supply Milgard and Oracle with his PII.

220.    Plaintiff Pentz is very careful about sharing his sensitive PII. Plaintiff Pentz stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

221.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Pentz's PII in their system.

222.    As a result of the Data Breach, Plaintiff Pentz made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure his accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Pentz has spent significant on mitigation activities in response to the Data Breach—valuable time Plaintiff Pentz otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

223.    Subsequent to the Data Breach, Plaintiff Pentz has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with

attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

224.    The Data Breach has caused Plaintiff Pentz to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

225.    As a result of the Data Breach, Plaintiff Pentz anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

226.    As a result of the Data Breach, Plaintiff Pentz is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

227.    Plaintiff Pentz has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

<u>Plaintiff Julie Rachel's Experience</u>

228.    Defendant Cox obtained Plaintiff Rachel's PII in the course of conducting its regular business operations, related to Plaintiff Rachel's employment.

229.    As a condition of her employment at Cox, she was required to supply Cox and Oracle with her PII.

230. Plaintiff Rachel is very careful about sharing her sensitive PII. Plaintiff Rachel stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

231. Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Rachel's PII in their system.

232. As a result of the Data Breach, Plaintiff Rachel made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure her accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Rachel has spent significant on mitigation activities in response to the Data Breach—valuable time Plaintiff Rachel otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

233. Subsequent to the Data Breach, Plaintiff Rachel has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

234. The Data Breach has caused Plaintiff Rachel to suffer fear, anxiety, and stress,

which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

235.    As a result of the Data Breach, Plaintiff Rachel anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

236.    As a result of the Data Breach, Plaintiff Rachel is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

237.    Plaintiff Rachel has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

Plaintiff Jose Santos's Experience

238.    Defendant Yurman obtained Plaintiff Santos's PII in the course of conducting its regular business operations, related to Plaintiff Santos's employment.

239.    As a condition of his employment at Yurman, he was required to supply Yurman and Oracle with his PII.

240.    Plaintiff Santos is very careful about sharing his sensitive PII. Plaintiff Santos stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

241.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Santos's PII in their system.

242.    As a result of the Data Breach, Plaintiff Santos made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure his accounts are secured, and signing up for credit monitoring

insurance services. Plaintiff Santos has spent significant on mitigation activities in response to the Data Breach--valuable time Plaintiff Santos otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

243.    Subsequent to the Data Breach, Plaintiff Santos has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

244.    The Data Breach has caused Plaintiff Santos to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed his of key details about the Data Breach's occurrence.

245.    As a result of the Data Breach, Plaintiff Santos anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

246.    As a result of the Data Breach, Plaintiff Santos is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

247.    Plaintiff Santos has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

Plaintiff Barry Schwartze's Experience

248.    Defendant Trimble obtained Plaintiff Schwartze's PII in the course of conducting its regular business operations, related to Plaintiff Schwartze's employment.

249.    As a condition of his employment at Trimble, he was required to supply Trimble and Oracle with his PII.

250.    Plaintiff Schwartze is very careful about sharing his sensitive PII. Plaintiff Schwartze stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

251.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Schwartze's PII in their system.

252.    As a result of the Data Breach, Plaintiff Schwartze made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure his accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Schwartze has spent significant on mitigation activities in response to the Data Breach—valuable time Plaintiff Schwartze otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

253.    Subsequent to the Data Breach, Plaintiff Schwartze has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his PII;

(iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

254.    The Data Breach has caused Plaintiff Schwartze to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed his of key details about the Data Breach's occurrence.

255.    As a result of the Data Breach, Plaintiff Schwartze anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

256.    As a result of the Data Breach, Plaintiff Schwartze is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

257.    Plaintiff Schwartze has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

<u>Plaintiff Deidre Swoope's Experience</u>

258.    Defendant GlobalLogic obtained Plaintiff Swoope's PII in the course of conducting its regular business operations, related to Plaintiff Swoope's employment.

259.    As a condition of her employment at GlobalLogic, she was required to supply

GlobalLogic and Oracle with her PII.

260.    Plaintiff Swoope is very careful about sharing her sensitive PII. Plaintiff Swoope stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

261.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Swoope's PII in their system.

262.    As a result of the Data Breach, Plaintiff Swoope made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure her accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Swoope has spent significant on mitigation activities in response to the Data Breach--valuable time Plaintiff Swoope otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

263.    Subsequent to the Data Breach, Plaintiff Swoope has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to

protect the PII.

264.    The Data Breach has caused Plaintiff Swoope to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

265.    As a result of the Data Breach, Plaintiff Swoope anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

266.    As a result of the Data Breach, Plaintiff Swoope is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

267.    Plaintiff Swoope has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

Plaintiff Kyle Troskot's Experience

268.    Defendant Rheem obtained Plaintiff Troskot's PII in the course of conducting its regular business operations, related to Plaintiff Troskot's employment.

269.    As a condition of his employment at Rheem, he was required to supply Rheem and Oracle with his PII.

270.    Plaintiff Troskot is very careful about sharing his sensitive PII. Plaintiff Troskot stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

271.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Troskot's PII in their system.

272.    As a result of the Data Breach, Plaintiff Troskot made reasonable efforts to

mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach, contacting banks to ensure his accounts are secured, and signing up for credit monitoring insurance services. Plaintiff Troskot has spent significant on mitigation activities in response to the Data Breach--valuable time Plaintiff Troskot otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

273.    Subsequent to the Data Breach, Plaintiff Troskot has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

274.    The Data Breach has caused Plaintiff Troskot to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

275.    As a result of the Data Breach, Plaintiff Troskot anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

276.    As a result of the Data Breach, Plaintiff Troskot is at a present risk and will

continue to be at increased risk of identity theft and fraud for years to come.

277.    Plaintiff Troskot has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

278.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

279.    The Class that Plaintiffs seek to represent is defined as follows:

**All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the "Class").**

280.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

281.    Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

282.    Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Potentially thousands of people were impacted by the Data Breach. The Class is apparently identifiable within Defendants' records.

283.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendants had a duty to protect the PII of Plaintiffs and Class Members;

b. Whether Defendants had respective duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendants had respective duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the PII of Plaintiffs and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiffs and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants' wrongful conduct; and,

k.    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

284.    <u>Typicality.</u> Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

285.    <u>Policies Generally Applicable to the Class.</u> This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

286.    <u>Adequacy.</u> Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

287.    <u>Superiority and Manageability</u>. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

288.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

289.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

290.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

291.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the PII of Class Members, Defendants may continue to refuse to provide proper

notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

292.    Further, Defendant have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

293.    Likewise, particular issues under Rule 23(c)(2) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendants failed to timely notify the Plaintiffs and the class of the Data Breach;

    b.   Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    c.   Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d.   Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

    e.   Whether Defendants failed to take commercially reasonable steps to safeguard its employees' PII; and,

    f.   Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and All Class Members)

294.    Plaintiffs re-allege and incorporate by reference all of the preceding allegations, as if fully set forth herein.

295.    Defendants require its employees, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing its services.

296.    Defendants gathered and stored the PII of Plaintiffs and Class Members as part of their business of soliciting its employees, which solicitations and services affect commerce.

297.    Plaintiffs and Class Members entrusted Defendants with their PII with the understanding that Defendant would safeguard their information.

298.    Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

299.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

300.    Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

301.    Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure

that its systems and networks, and the personnel responsible for them, adequately protected the PII.

302.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential PII, a necessary part of obtaining employment at Defendants.

303.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

304.    Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiffs or the Class.

305.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove former employees' PII it was no longer required to retain pursuant to regulations.

306.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

307.    Defendants had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

308.    Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not

limited to, the following:

  a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

  b. Failing to adequately monitor the security of their networks and systems;

  c. Allowing unauthorized access to Class Members' PII;

  d. Failing to detect in a timely manner that Class Members' PII had been compromised;

  e. Failing to remove former employees' PII they were no longer required to retain pursuant to regulations, and;

  f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

309. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

310. Defendants' violation of Section 5 of the FTC Act constitutes negligence.

311. Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

312. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices,

caused the same harm as that suffered by Plaintiffs and the Class.

313. Defendants had a duty under the TDTPA to keep confidential Plaintiffs' and the Class Members' PII or otherwise notify Plaintiffs and the Class Members of their vulnerable network.

314. Defendants' violation of the TDTPA constitutes negligence.

315. Plaintiffs and the Class Members are within the class of persons the TDTPA was intended to protect and the type of harm that resulted from the Data Breach is the type of harm that the statute intended to guard against.

316. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

317. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting employers in possession of PII.

318. Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed. Defendants knew or should have known of the risks of harm to Plaintiffs and members of the Class in the event of a data breach because such harms were foreseeable given the nature of maintaining vast amounts of unencrypted PII of Plaintiff and the Class. Defendants' security systems were deficient.

319. Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in

collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems.

320.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

321.    Plaintiffs and the Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

322.    Defendants were in a superior position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

323.    Defendants' duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

324.    Upon information and belief, Defendants have admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

325.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

326.    There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII

by adopting, implementing, and maintaining appropriate security measures.

327.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

328.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

329.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

330.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

331.    Defendants' negligent conduct is ongoing, in that it still holds the PII of Plaintiffs and Class Members in an unsafe and insecure manner.

332.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**<u>(On Behalf of Plaintiffs and All Class Members)</u>**

333.    Plaintiffs re-allege and incorporate by reference all of the preceding allegations, as if fully set forth herein.

334.    Plaintiffs and Class Members were required deliver their PII to Defendants as part of the process of obtaining employment at Defendants. Plaintiffs and Class Members provided their labor and PII to Defendants with the assumption that a portion of its earnings would be used to adequately safeguard their PII and would not have obtained employment at Defendant had they known that Defendants' data security practices were substandard.

335.    Defendant solicited, offered, and invited Class Members to provide their PII as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their PII to Defendants.

336.    Defendants accepted possession of Plaintiffs' and Class Members' PII for the purpose of performing its regular business operations.

337.    Plaintiffs and the Class entrusted their PII to Defendants. In so doing, Plaintiffs and the Class entered into implied contracts with Defendants by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and

accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

338.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

339.    Implicit in the agreement between Plaintiffs and Class Members and the Defendants to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential. Further, Plaintiffs did not give Defendants permission to maintain their PII forever; a reasonable duty to purge this information was implied in the agreement to provide it as an employee.

340.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendants, on the other, is demonstrated by their conduct and course of dealing.

341.    On information and belief, at all relevant times Defendants promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

342.    On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

343.    Plaintiffs and Class Members provided their labor to Defendants with the reasonable belief and expectation that Defendants would use part of its earnings to obtain adequate data security. Defendants failed to do so.

344.    Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

345.    Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

346.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

347.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

348.    Defendants breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

349.    Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of PII and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

350.    As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

351.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

352.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and All Class Members)**

353.    Plaintiffs re-allege and incorporate by reference all of the preceding allegations, as if fully set forth herein.

354.    This Count is pleaded in the alternative to the breach of implied contract (Count II).

355.    Plaintiffs and Class Members conferred a monetary benefit on Defendants.

Specifically, they provided their labor to Defendants and/or its agents and in so doing also provided Defendants with their PII. In exchange, Plaintiffs and Class Members should have received from Defendants the employment positions that were the subject of the transactions and should have had their PII protected with adequate data security.

356.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendants profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes.

357.    Defendants failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

358.    Defendants acquired the PII through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

359.    If Plaintiffs and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would have entrusted their PII with Defendants.

360.    Plaintiffs and Class Members have no adequate remedy at law.

361.    Defendants enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security

and the safety of their PII.

362.   Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

363.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

364.   Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

365.   Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT IV
## DECLARATORY JUDGMENT
### (On Behalf of Plaintiffs and All Class Members)

366.    Plaintiffs incorporate by reference the forgoing paragraphs as though fully set forth herein.

367.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Further, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

368.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and the Class's PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and the Class from further data breaches that compromise their PII. Plaintiffs allege that Defendant's data security measures remain inadequate. Defendants publicly deniy these allegations. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future. It is unknown what specific measures and changes Defendants have undertaken in response to the Data Breach.

369.    Plaintiffs and the Class have an ongoing, actionable dispute arising out of Defendants' inadequate security measures, including (i) Defendant's failure to encrypt Plaintiffs' and the Class's PII, including Social Security numbers, while storing it in an Internet-accessible environment, and (ii) Defendants' failure to delete PII it has no reasonable need to maintain in an Internet-accessible environment, including the Social Security numbers of Plaintiffs and the Class.

370.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Defendants owe a legal duty to secure the PII of Plaintiff and the Class;

b.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure employees' PII; and

c.  Defendants' ongoing breaches of its legal duty continue to cause Plaintiffs and the Class harm.

371.   This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry and government regulatory standards to protect employees' PII. Specifically, this injunction should, among other things, direct Defendants to:

a.  Engage third party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

b.  Audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

c.  Regularly test its systems for security vulnerabilities, consistent with industry standards; and

d.  Implement an education and training program for appropriate employees regarding cybersecurity.

372.   If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

373.    The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

374.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiffs and others whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendants and that the Court grants the following:

A.    For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii.    requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

v.    prohibiting Defendants from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

Vi.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix.     requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.      requiring Defendants to conduct regular database scanning and securing checks;

xi.     requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.    requiring Defendants to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendants to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.    requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately

monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.  requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees and costs as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury on all claims so triable.

Dated: November 19, 2025

Respectfully submitted,


<u>*/s/ William B. Federman*</u>
William B. Federman
Tex. Bar No. 00794935
Jessica A. Wilkes
**Federman & Sherwood**
4131 Central Express Way, Ste. 900
Dallas, Texas 75204
Telephone: (800) 237-1277
E: wbf@federmanlaw.com
E: jaw@federmanlaw.com

*Attorneys for Plaintiffs and the Proposed Class*